# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF KENTUCKY – At Covington

| | |
|---|---|
| **LAURA SHANKS and** | : |
| **AMY DOWNTON** | |
|     **c/o Christopher Wiest, Esq.** | : |
|     **25 Town Center Blvd, Ste. 104** | |
|     **Crestview Hills, KY 41017** | : |
| | |
|     **Plaintiffs** | : |
| | |
| **v.** | : |
| | |
| **DAVID RUST** | : |
| **10520 Bellepointe Dr.** | |
| **Alexandria, KY 41001** | : |
| | |
| **AND** | : |
| | |
| **JANIS WINBIGLER** | : |
| **12 Observatory Pointe Dr.** | |
| **Wilder, KY 41076** | : |
| | |
| **AND** | : |
| | |
| **AMANDA DONELAN** | : |
| **14 Crown Point** | |
| **Ft Thomas, KY 41075** | : |
| | |
| **AND** | : |
| | |
| **ZACH STEWART** | : |
| **8774 Constable Dr** | |
| **Alexandria, KY 41001** | : |
| | |
| **AND** | : |
| | |
| **CAMPBELL COUNTY BOARD OF** | : |
| **EDUCATION** | |
|     **c/o Janis Winbigler** | : |
|     **101 Orchard Ln** | |
|     **Alexandria, KY 41001** | : |
| | |
|     **Defendants** | : |

1

## PLAINTIFFS' VERIFIED COMPLAINT FOR MONEY DAMAGES, DECLARATORY RELIEF, AND INJUNCTIVE RELIEF

Plaintiffs, through Counsel, for their Verified Complaint, state and allege as follows:

### Introduction

1. This lawsuit stems from Defendants' efforts to enforce a mask mandate in September, 2021, in relation to their public meetings, leading to the unlawful arrest of Plaintiff Laura Shanks, and the unlawful exclusion of Plaintiff Downton; Defendants did so in contravention of an injunction this Court issued; they did so contrary to Kentucky statutes; they did so in contravention of the First Amendment; they did so in contravention of the Fourth Amendment; and they did so in contravention of the Americans with Disabilities Act. They are not a law unto themselves, and this lawsuit seeks to hold them accountable for their misconduct.

### Parties

2. Plaintiff Laura Shanks ("Shanks") is, and at all times relevant hereto has been a resident of Kentucky and this District and division. She is a resident of Campbell County, Kentucky. Her children are enrolled in the Campbell County public schools.

3. Plaintiff Amy Downton ("Downton") is, and at all times relevant hereto has been a resident of Kentucky and this District and division. She is a resident of Campbell County, Kentucky. Her children are enrolled in the Campbell County public schools. Downton is also a military veteran with a medical disability diagnosis, to include diagnosed military-connected post-traumatic stress disorder, and, in connection with that, has had government medical officials instruct (and have confirmed in writing) that she be exempt from face covering requirements due to that disability (the "Disability"). Her

2

Disability and government diagnosis of same, occurred prior to, and was effective on, September 20, 2021.

4. Defendant David Rust ("Rust") was, throughout the month of September, 2021, the duly appointed superintendent of the Campbell County, Kentucky, School District ("District"), with powers and duties as set forth in KRS 160.370(1).  He is sued in his individual capacity.

5. Defendant Janis Winbigler ("Winbigler") was, throughout the month of September, 2021, an elected member of the Campbell County Board of Education, and, in that same timer period, served as the Board Chair of the Campbell County Board of Education ("Board"). She, with the remainder of the Board, had the duties as set forth in KRS 160.290.  She is sued in her official and individual capacities.

6. Defendants Amanda Donelan ("Donelan") and Zach Stewart ("Stewart") were, in and throughout September, 2021, duly appointed police officers with the Campbell County Police Department.  Donelan served as a school resource officer for the District and Board in September, 2021.  They are sued in their official individual capacities.

7. The Campbell County Board of Education ("Board") is the duly authorized school board for the District.  It is sued in its official capacity.

**<u>Jurisdiction and Venue</u>**

8. Subject matter jurisdiction over the federal claims and causes of action asserted by the Plaintiff in this action is conferred on this Court pursuant to 28 U.S.C. §1331, 42 U.S.C. § 1983, 42 U.S.C. § 1988, 29 U.S.C. § 794a, 28 U.S.C. §§ 2201 and 2202, and other applicable law.

9. This Court has personal jurisdiction over Defendants because they are citizens of and reside in Kentucky and this judicial district.

10. Venue is proper in this District and Division under 28 U.S.C. 1391(b)(1) and (2) in that the Defendants reside in, and the facts giving rise to this matter arose in, the Eastern District of Kentucky and the Covington Division.

## Facts

11. The COVID-19 pandemic has, on a fundamental level, tested our commitment to our constitutional rights and separation of powers.

### History of emergency powers, legislation, and court decisions

12. Governor Andrew Beshear, Kentucky's current Governor (who was also the Governor throughout 2020 and 2021), began responding to COVID-19 through a series of executive orders in March, 2020.

13. Governor Beshear's actions and executive orders were challenged in both state and federal courts in several cases.

14. In fact, some of those cases in federal court made clear, and created clearly established law, that requirements of the Constitution were not suspended due to a pandemic. *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear,* 977 F.3d 561 (6th Cir. 2020); *Ramsek v. Beshear*, 468 F. Supp. 3d 904 (EDKY 2020); *Oswald v. Beshear*, 555 F. Supp. 3d 475 (E.D. Ky. 2021).

15. In November, 2020, following state court litigation, the Kentucky Supreme Court adjudicated that he had the ability under KRS Chapter 39A, to issue executive orders, which included the ability to suspend state statutes. *Beshear v. Acree*, 615 SW 3d 780

4

(Ky. 2020).  But there was a caveat: that the legislature had the ability to engage in "legislative amendment or revocation of the emergency powers granted the Governor." *Id.* at 813.

16. The General Assembly in 2021 came into session with the purpose of curtailing what they perceived to be overreach by the Governor, and enacted, over gubernatorial vetoes, restrictions on his ability to promulgate executive orders, including his ability to suspend statutes, via legislation with emergency clauses for immediate operative effect.  *See, e.g.*, 21 RS SB 1,[1] 21 RS HB 1.[2]

17. The Governor was undeterred, and sued the legislature and Attorney General in state court, seeking to invalidate the legislation on dubious constitutional grounds; this was followed by another trip to the Kentucky Supreme Court, as well as filings in this Court. *Oswald v. Beshear*, 555 F. Supp. 3d 475 (E.D. Ky. 2021); *Cameron v. Beshear*, 628 SW 3d 61 (Ky. 2021).

18. By mid-August 2021, as the *Cameron* case was being litigated in the Kentucky Supreme Court, Governor Beshear issued an executive order, Executive Order 2021-585, dated August 10, 2021 directing face coverings in schools, with immediate effect.  Executive Order 2021-585 contained an exemption from the face covering requirement for persons with disabilities.

19. In the same vein, the Kentucky Department of Education issued an emergency regulation, 702 K.A.R. 1:195E, relating to masks in schools, on August, 12, 2021 ("KDE Mask Regulation").  Among other things, the KDE Mask Regulation required face coverings in

---

[1] https://apps.legislature.ky.gov/record/21rs/sb1.html (last visited 9/2/2022).
[2] https://apps.legislature.ky.gov/record/21rs/hb1.html (last visited 9/2/2022).

school facilities, which was defined as a building or vehicle "where one or more students are present."  The KDE Regulation likewise contained an exemption for persons with disabilities.

20. That prompted the filing in this court of the *Oswald*, 555 F. Supp. 3d 475 matter.

21. On August 19, 2021, this Court issued a temporary restraining order in *Oswald*, which, among other things, enjoined the Governor, and those acting in concert with him, from enforcing his face mask mandate.

22. The Kentucky Supreme Court then decided *Cameron*, 628 SW 3d 61, on August 21, 2021.  *Cameron* made clear, on that same date, that the legislation passed in 2021, to curb the Governor's powers, were lawful enactments and effective.

23. After *Cameron*, on August 23, 2021, Governor Beshear issued Executive Order 2021-632, which rescinded Executive Order 2021-585, with immediate effect.

24. That confluence of events caused the Governor to call the Kentucky General Assembly into special session, in early September, 2021.

25. Among other things, the General Assembly passed 2021 SS SB1 on September 9, 2021, with an emergency clause for immediate operative effect.[3]  Among other things, Section 2 of 2021 SS SB 1 invalidated the KDE Mask Regulation "five (5) working days from September 9, 2021," or in any event not later than September 17, 2021.

26. Section 3 of 2021 SS SB1 required a school operational plan for COVID-19, but the statute did not provide for that plan to supplant or suspend other state statutes.  Other sections of the Bill, such as Section 5 or Section 6 of 2021 SS SB1, had "notwithstanding" provisions that did suspend other state laws.

---

[3] https://apps.legislature.ky.gov/record/21SS/sb1.html (last visited 9/2/2022).

6

27. In short, by September 19, 2021, there were (i) no executive orders by the Governor that required face masking in schools, (ii) no state regulation in effect that required face masking in schools; and (iii) ordinary and customary state law applied insofar as face masking was concerned.

<u>Open Meetings Law, Campbell County School Board, its policies, and COVID-19 responses in the summer and early fall of 2021</u>

28.  The Board and/or District are recipients of federal funding, both directly, and by and through funding provided to the Commonwealth from the United States Government.

29. Kentucky has a robust open meetings law, codified at 61.800, *et. seq.* Among other things, the Kentucky Open Meetings Act provides at KRS 61.800 a public policy "that the formation of public policy is public business and shall not be conducted in secret and the exceptions provided for by KRS 61.810 or otherwise provided for by law shall be strictly construed." Further, KRS 61.610(1) provides in relevant part that "[a]ll meetings of a quorum of the members of any public agency at which any public business is discussed or at which any action is taken by the agency, shall be public meetings, open to the public at all times." And, further, KRS 61.840 provides, in relevant part, that:

"No condition other than those required for the maintenance of order shall apply to the attendance of any member of the public at any meeting[4] of a public agency. No person may be required to identify himself in order to attend any such meeting. All agencies shall provide meeting room conditions, including adequate space, seating, and acoustics, which insofar as is feasible allow effective public observation of the public meetings. All agencies shall permit news media coverage, including but not limited to recording and broadcasting."

---

[4] The definition the General Assembly applied to "meeting" in KRS 61.805(1), which includes in the definition of "meeting" not only the gaveled in meeting, but "gatherings of every kind," as well as "<u>informational</u> or <u>casual gatherings</u> held **in anticipation of** or **in conjunction with** a regular or special meeting."

7

30. In furtherance of the Kentucky Open Meetings Act, the Campbell County School Board enacted several Board Policies, binding on the Superintendent, including Board Policy 01CJ421, which was adopted March 15, 2021.  In relevant part, that Board Policy stated that: "The chairperson may impose conditions upon attendance at a given meeting only if such conditions are required for the maintenance of order."  The same board policy likewise provided for public input and participation, permitting up to 3 minutes to speak at each meeting.

31. On June 24, 2021, the Kentucky Attorney General caused a memorandum styled "*Attorney General Advisory: Changes to the Open Records Act and Open Meetings Act following the Regular Session of the 2021 General Assembly*" to be sent to all public agencies, including the Campbell County Board of Education.  In relevant part, it notified public agencies that "several pending court actions that have resulted in conflicting decisions," that "the Attorney General recommends that public agencies comply with the Open Records Act and Open Meetings Act without resorting to any temporary changes" relating to COVID-19, because "[d]oing so will ensure that public agencies meet the requirements of the Open Records Act and Open Meetings Act regardless of how courts ultimately rule."  Further, it advised that "if the courts ultimately find that HJR 77 is constitutional, then that will mean that the state of emergency has expired," and "[p]ublic agencies must return to normal operations under the Open Meetings Act once the state of emergency expires."

32. By July of 2021, Superintendent Rust, Chair Winbigler, and the Board were undertaking steps and planning to resume school for the 2021-2022 school year.

8

33. Among other things, in July, 2021, the Board delegated to Superintendent Rust the ability to make changes to plans for COVID-19 purposes, in part, because case incidence rate, as well as the legal backdrop, were rapidly evolving.

34. By the August 16, 2021 regular Campbell County School Board meeting, face coverings had become a heated topic, particularly among parents who objected to their children being subjected to a learning environment in which face masks detracted from the children's ability to learn.

35. In advance of that meeting, Rust and Winbigler discussed whether they would require, versus merely encourage, face masking for participants at the meeting.  Their interpretation of the Governor's Executive Order 2021-585 and KDE Mask Regulation led them to conclude that they would require face masks, and they did so.

36. Several participants at that meeting refused to comply with the face mask requirement, and, further, several parents of students, including Shanks and Downton, spoke in forceful opposition to face masking requirements at that August 16, 2021 meeting.

37. The Board, Rust, and Winbigler were not appreciative of members of the public who spoke in opposition of face masking requirements at the August 16, 2021 meeting.

The September 20, 2021 Meeting

38. On September 20, 2021, the Campbell County Board of Education held their September regular meeting at 101 Orchard Lane, in Alexandria, Kentucky ("Orchard Property").

39. In advance of that meeting, approximately 30 minutes before the start of the meeting on September 20, 2021, Superintendent Rust opened the meeting room to the public so that they could take their seats prior to calling the meeting to order at 6:00 p.m.

40. Further, the Superintendent, Board, and Winbigler had implemented safety precautions, in connection with their public meetings, to include, without limitation, distancing between chairs and sanitation measures, both before and after the meeting.

41. On the agenda for the September 20, 2021 regular meeting was approval by the School Board of the school's COVID-19 operational plan, which intended to implement, among other things, a face masking requirement on students.

42. Winbigler and Rust both knew that the September 20, 2021 regular meeting would be attended by parents who opposed face masking requirements, and, in the same vein, both knew that these same parents would refuse to wear a face mask because the parents believed doing so would convey a particular message. Specifically, they knew that these parents intended to convey a message by not wearing a face mask, and that the failure to wear a face mask would be understood as a message.

43. For the avoidance of all doubt, the wearing of facemasks or the refusal to do so, was understood as a message, particularly at a televised meeting, which the September 20, 2021 meeting was. And, the message was widely understood as conveying such a message.

44. Further, these parents who opposed face masking requirements and refused to wear a face mask to convey a specific and particular message that such masks are neither medically nor scientifically necessary to prevent the spread of the coronavirus, that these intrusions on bodily integrity are unnecessary and non-essential, that informed consent and civil liberties prevail over government decisions regarding public health, and that individuals and parents must be given the choice to make their own decisions regarding their facial attire and medical choices.

45. Winbigler and Rust imposed a face masking requirement for participants at the September 20, 2021 meeting, to force these same parents to either bend to their preferred message by donning a facemask, or to be forced to leave the meeting so that they could not oppose the adoption of the operational plan that would place facemasks on children.

46. Winbigler and Rust did so, in part, and as they testified in state court, to continue to enforce the Governor's repealed Executive Order 2021-585, ignorantly unaware that it had been rescinded, and in contempt of this Court's order in *Oswald*.

47. The face masking requirement, in connection with, and as a condition of attendance for the September 20, 2021 meeting, was not required for the maintenance of order at the meeting, and thus contravened the Kentucky Open Meetings Act.

48. Both Winbigler and Rust testified in state court that a failure to wear a mask by a participant at that meeting would not have impeded the ability of the Board to get through its business, would not have required Winbigler to have stopped the meeting, there was no such requirement for attendance at meetings prior to March, 2020, and when Winbigler, Rust, and the Board lifted the face masking requirement in early winter, 2021, there was no impediment towards completing Board business.

49. For the avoidance of all doubt, the face masking requirement in connection with the September 20, 2021 meeting, violated the Kentucky Open Meetings Act.

50. Shanks and Downton both arrived at the Orchard Property between 5:30 p.m. and 5:45 p.m., with the intention of attending the September 20, 2021 regular meeting, and, among other things, opposing the imposition of a face masking requirement on students.

11

51. Both Shanks and Downton attended the September 20, 2021 meeting, and both refused to wear a facemask for, among other reasons, the reasons set forth in Paragraph 42, 43, and 44.

52. Further, Downton medically could not wear such a facemask, due to her diagnosed Disability.

53. Both Shanks and Downton proceeded to find open chairs, sat down, and neither were making any noise as they patiently waited for the meeting to begin.

54. Winbigler and Rust directed Donelan to approach Shanks and Downton, and direct them to either place a facemask on, leave the public meeting, or be arrested.

55. At the same time, Winbigler and Rust did not direct the removal or the forcing of face coverings of *every* parent or citizen who was not wearing a face mask; rather, the actions were solely directed at those parents or citizens who had previously voiced opposition to the face covering requirements at the August Board meeting.

56. Donelan followed the directives of Rust, and, at approximately 5:45 p.m. on September 20, 2021, approached Shanks and Downton, directed them to either place a facemask on, told them they had to leave the public meeting if they refused, and threatened them with arrest.

57. Downton informed Donelan, Rust, and Winbigler, in a calm voice, that she had a diagnosed Disability, and requested a reasonable accommodation to remain at the meeting. Rust told her that unless she could produce her medical records there and then, he would not even consider an accommodation. When Downton informed Rust that she did not keep copies of her personal medical records on her, but would be happy to produce same the following day, Donelan, Rust, and Winbigler refused her request for an

12

accommodation, and told her that her options were to place a facemask on, leave the public meeting if she refused, or be arrested if she did not leave.

58. Not long after that, Stewart arrived on the scene, who joined with Donelan in the threats of arrest directed at Shanks and Downton.

59. Downton asked Donelan to prepare a police report regarding the incident, to which she agreed, and Downton then left after Donelan, Stewart, Rust, Winbigler, and the Board, refused to accommodate her Disability.

60. Shanks, on the other hand, explained to Donelan and Stewart that their actions were in contravention of law, that she had a right to attend the meeting, and that there was no legal basis to require face masking to attend a public meeting.

61. Donelan told Shanks that she could argue her removal in court, and then Donelan, Stewart, Rust, and Winbigler instructed that if Shanks did not place a facemask on or leave the public meeting she would be arrested.

62. Shanks failed to put on the facemask, nor did she leave, and then Donelan and Stewart arrested her, at the directive of Rust and/or Winbigler, on trumped up charges of alleged Disorderly Conduct Second (KRS 525.060) and Trespass Second (KRS 511.070).

63. To the extent Donelan or Stewart suggest they were just following the illegal orders of Rust or Winbigler, and as the Sixth Circuit has observed, "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004) (internal quotation marks and citations omitted)).

13

64. For the avoidance of all doubt, there was no probable cause for either charge against Shanks.

65. Two other Campbell County citizens then pursued an Open Meetings lawsuit in state court related to the September 20, 2021 meeting, and, in the matter of *Moellman v. Campbell Coutny Board of Education*, 21-CI-762, the Campbell Circuit Court found not only a violation of the act, but that the violations were willful related to the mask requirement on September 20, 2021. The Circuit Court also voided all actions at that meeting.

## COUNT I – 42 USC § 1983 – Downton/Shanks, First Amendment Violation (against the individual Defendants in their individual capacities, and *Monell* Liability for same by the Defendant Board)

66. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

67. The First Amendment provides in relevant part that "Congress shall make no law … abridging the freedom of speech … [or the] right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

68. Among the long-established rights protected by the First Amendment is "a right to associate for the purpose of engaging in [] activities protected by the First Amendment-- speech, assembly, [and] petition for the redress of grievances." *Roberts v. United States Jaycees*, 468 U.S. 609, 618, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984).

69. Moreover, Plaintiffs had and have a First Amendment right not to be excluded from a forum that is generally held open to the public. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983).

14

70. Campbell County School Board meetings, including that conducted on September 20, 2021, are limited public forums. *Id.*; *Schlegel v. Craft*, 2005 U.S. Dist. LEXIS 16798 (KYWD 2005).

71. The exclusion of Shanks and Downton from the September 20, 2021 meeting, was based on their viewpoints about the mask policy, known to Defendants because of their refusal to wear a mask.

72. Under clearly established case law, including that set forth in *Schlegel*, a person may not be removed from a "meeting, thus preventing her from exercising her constitutionally-guaranteed right to free expression, when she has not acted disruptively."

73. The requirement to wear a mask at the September 20, 2021 meeting, as well as the refusal to do so, was symbolic speech. This requirement, in these circumstances, is a symbolic act or display that is sufficiently imbued with elements of communication with both an intent to convey a particularized message and a great likelihood that the message would be understood by those who viewed the symbolic act or display. This was an attempt by Defendants to prescribe what shall be orthodox in politics, science, and medicine, despite a legitimate divergence of opinions, and constituted viewpoint discrimination in a limited public forum.

74. Further, Plaintiffs' failure to wear masks was done to express symbolic speech, including as a form of protest against unscientific, governmental mandates directing what people wear. It was not disruptive. However, the rules in question were enacted for partisan purposes based on disagreement with the views of these Plaintiffs, and they were enforced in a partisan and viewpoint discriminatory manner to prohibit such symbolic speech from these Plaintiffs.

75. Furthermore, the removal or directed removal of Shanks and Downton from the September 20, 2021 meeting, was due solely to both having engaged in constitutionally protected speech, including their vocal speech at the August, 2021 meeting, and their subsequent refusal to wear a face mask, which was also symbolic speech.

76. The removal of Downton and the arrest of Shanks would deter a person of ordinary firmness from continuing to engage in that conduct.

77. The removal of Downton and the arrest of Shanks were motivated, at least in part, based on Shanks and Downton's protected conduct.

78. The preceding paragraphs constitute violations of clearly established First Amendment rights, both as to viewpoint discriminatory conduct in a limited public forum, as well as First Amendment retaliation.

79. Defendants Winbigler, Rust, Donelan, Stewart, in their individual capacities, and while acting under color of any statute, ordinance, regulation, custom, or usage, and exercising and abusing powers granted to them from the Commonwealth of Kentucky, subjected, or caused to be subjected, the Plaintiffs, who are persons within the jurisdiction of the United States, to be deprived of his rights, privileges, or immunities secured by the Constitution and United States laws.  They are therefore liable to them pursuant to 42 U.S.C. 1983 under an action at law, suit in equity, or other proper proceeding for redress. They are further liable to the Plaintiffs for their reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

80. Further, Winbigler and Rust, acting in an ultimate policy-making role for this issue, as well as their directives to, and approval of, the removal of the Plaintiffs from the meeting, exposed the Defendant Board to liability under *Monell v. Department of Social Services*,

16

436 U.S. 658 (1978); *Baar v. Jefferson County Bd. of Educ.*, 476 Fed. Appx. 621 (6th Cir. 2012).

81. These First Amendment/First Amendment retaliation violations have proximately and actually caused Plaintiffs damages, in an amount to be proven at trial, but exceeding $10,000.

82. Plaintiffs further seek punitive damages against Defendants, since the actions complained of were motivated by evil motive or intent, and/or when it involves reckless or callous indifference to the federally protected rights of Plaintiff.  Plaintiff demands judgment on these punitive damages against Defendants in an amount to be determined at trial.

### COUNT II – 42 USC § 12131 and 29 U.S.C. 794 – Downton Title II ADA and Rehabilitation Act Violations (against the individual Defendants in their official capacities, and as against the Board)

83. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

84. The Board is a public entity as that term is defined in 42 U.S.C. § 12131(a)(1)(B) of the Americans with Disabilities Act ("ADA").

85. Plaintiff Downton is a "qualified individual with a disability" as that term is defined in 42 U.S.C. § 12131(a)(2).

86. Downton, who, because of her medically diagnosed Disability, was unable to wear a facemask, was, by reason of such disability, excluded from participation in and/or was denied the benefits of the services, programs, or activities of the Campbell County Board of Education, and specifically the ability to participate and attend the September 20, 2021 school board meeting, and was, further, subjected to discrimination by any such entity, all in contravention of 42 U.S.C. § 12132.

17

87. Pursuant to, and in violation of, 29 U.S.C. § 794 of the Rehabilitation Act, Downton was a qualified individual with a disability in the United States, as defined in section 29 USCS § 705(20).  She was, on September 20 2021, solely by reason of her or his disability, excluded from the participation in, denied the benefits of, and was subjected to discrimination by Rust, Winbigler, and the Board; specifically, she was excluded, under threat of arrest, from the meeting.

88. The Board and District receives Federal financial assistance, as does the Campbell County Police Department.

89. Implementing ADA regulations, 28 C.F.R. § 35.130(b)(7)(i), likewise provides that "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  Further, 28 C.F.R. § 35.130(a) states that "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."  And finally, 28 C.F.R. § 35.150(a), requires a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."

90. Under Title II, a claim of discrimination "encompasses virtually everything that a public entity does," "subject . . . to the bounds of reasonableness." *Tri-Cities Holdings, LLC v. Tenn. Admin. Procedures Div.*, 726 F. App'x 298, 307-08 (6th Cir. 2018) (quotation

omitted); *see Johnson v. City of Saline*, 151 F.3d 564, 571 (6th Cir. 1998) ("Title II is broadly applicable to all of the activities of a public entity.").

91. The Sixth Circuit has interpreted meaningful access to equate with a requirement to grant reasonable accommodations. *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907, 909-10 (6th Cir. 2004).

92. Downton is disabled within the meaning of the ADA and Rehabilitation Act; she was "qualified" to participate in the "services, programs, or activities" of the Board and attend the meeting in question; she was "excluded from participation in" or "denied the benefits of" the Board meeting, which constituted some of the school's "services, programs, or activities"; and this exclusion or denial occurred "by reason of" Downton's disability.

93. The Defendant Board, Rust, Winbigler, Donelan, and Stewart could have reasonably accommodated Downton by permitting her to remain, but refused to do so.

94. The Rehabilitation Act, at 29 U.S.C. 794a(2), incorporates the remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), for violations.

95. Both provisions include a private right of action for damages. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

96. Plaintiff Downton was injured due to the failure to accommodate her disability by Defendants Rust, Winbigler, Donelan, and Stewart in their official capacities, and by the Board, and each of the foregoing Defendants are liable to her for such damages that were proximately and actually sustained thereby to be proven at trial, including her reasonable attorney fees and costs under 29 U.S. Code § 794a(b).

19

97. Ms. Downton also seeks injunctive relief against the Defendants, to prevent them from excluding her from future meetings on the basis of her Disability.

## COUNT III – 42 USC § 1983 –Shanks Fourth Amendment Violation (Rust, Winbigler, Donelan, and Stewart in their individual capacities and *Monell* Liability for same by the Defendant Board)

98. Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

99. It is well settled that the Fourth and Fourteenth Amendments require probable cause to justify arresting an individual. *See, e.g., Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964) ("The constitutional right to 'freedom from arrest in the absence of probable cause' is clearly established within our circuit."); *Parsons v. City of Pontiac*, 533 F.3d 492, 504 (6th Cir. 2008).

100.    There was no probable cause to arrest Ms. Shanks for the following reasons:

a.    for the Criminal Trespass Second Charge, Ms. Shanks had to defy a *lawful order* to leave the premises, KRS 511.070(1); KRS 511.090(2) ("A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license or privilege unless he defies a lawful order not to enter or remain personally communicated to him by the owner of such premises or other authorized person"); and no order for to leave, given that she was simply sitting down and not disturbing the meeting, was *lawful* in light of her clear statutory ability to remain in light of the Kentucky Open Meetings Act, KRS 61.810; KRS 61.840, or Defendants' defiance of this Court's injunction in *Oswald*;

b.    for the Disorderly Conduct Charge, and there was no probable cause for that arrest either, since Ms. Shanks had every right to speak to Donelan and Stewart

20

and inform them she was not leaving, and to defy their unlawful directives to leave, *Kennedy*, 635 F.3d 210; *Houston v. Hill*, 482 US 451 (1987) ("The freedom of individuals verbally to oppose or to challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").

101.    Rust, Winbigler, Donelan, and Stewart each personally participated in the arrest of Ms. Shanks, with Rust and Winbigler insisting she be removed and when she did not leave, asked that she be arrested, and Donelan and Stewart following those unlawful directives, even though clear Sixth Circuit case law makes clear that "since World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy*, 595 F.3d 327, 337.

102.    Defendants thus have violated Plaintiff Shanks clearly established Fourth Amendment rights against being arrested without probable cause.

103.    Further, Winbigler and Rust, acting in an ultimate policy-making role for this issue, as well as their directives to, and approval of, the removal of the Plaintiffs from the meeting, exposed the Defendant Board to liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Baar v. Jefferson County Bd. of Educ.*, 476 Fed. Appx. 621 (6th Cir. 2012).

104.    Further, any mistakes of law that Defendants may argue, due to their simple inability to adhere to this Court's orders and injunctions, Kentucky Supreme Court

21

decisions, Attorney General decisions, and basic statutory law, is not reasonable, and provides them absolutely no defense since any mistake is not reasonable.

105.    Defendants Rust, Winbigler, Donelan, and Stewart, under color of any statute, ordinance, regulation, custom, or usage, and exercising and abusing powers granted to them from the Commonwealth of Kentucky, subjected, or caused to be subjected, the Plaintiff Shanks, who is a person within the jurisdiction of the United States, to be deprived of his rights, privileges, or immunities secured by the Constitution and United States laws. They are therefore liable to her pursuant to 42 U.S.C. 1983 under an action at law, suit in equity, or other proper proceeding for redress. They are further liable to the Plaintiff for her reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

106.    These Fourth Amendment violations have proximately and actually caused Plaintiff Shanks damages, in an amount to be proven at trial, but exceeding $10,000.

107.    Plaintiff Shanks further seek punitive damages against Defendants, since the actions complained of were motivated by evil motive or intent, and/or when it involves reckless or callous indifference to the federally protected rights of Plaintiff. Plaintiff demands judgment on these punitive damages against Defendants in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as prayed for, including:

A. That this Court issue a declaration that the practices complained of herein, by Defendants were and are unconstitutional and illegal;

22

B.  That Plaintiffs be awarded money damages, including both compensatory and punitive damages against the Defendants, in an amount to be proven at trial, and exceeding $10,000.00, exclusive of interest and costs;

C.  That trial by jury be had on all issues so triable;

D.  That Plaintiffs be awarded their costs in this action, including reasonable attorney fees under 42 U.S.C. § 1988 and 29 U.S.C. § 794a(b);

E.  That Plaintiff Downton be awarded injunctive relief against future exclusions from meetings on the basis of her Disability; and

F.  Such other relief as this Court shall deem just and proper.

<u>Jury Demand</u>

Plaintiff demands trial by jury for any and all claims so triable under FRCP 38.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
chris@cwiestlaw.com

/s/Brandon Voelker_____
Brandon Voelker (KBA 88076)
Gatlin Voelker, PLLC
50 East River Center, STE 1275
Covington, KY 41011
(859) 781-9100
bvoelker@gatlinvoelker.com
*Counsel for Plaintiffs*

23

## VERIFICATION

Pursuant to 28 U.S.C. 1746, I, Amy Downton declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate and any documents attached are true and accurate copies of what they purport to be.

Executed on ___6 SEP 22___.

_Amy Downton_
Amy Downton

## VERIFICATION

Pursuant to 28 U.S.C. 1746, I, Laura Shanks declare under penalty of perjury that I have read the foregoing Verified Complaint, and state that the factual statements therein are true and accurate and any documents attached are true and accurate copies of what they purport to be.

Executed on ___9-5-22___.

_Laura L. Shanks_
Laura Shanks

1